423 So.2d 376 (1982)
The MIAMI HERALD PUBLISHING COMPANY, Appellant,
v.
Aurelio ANE, Appellee.
No. 79-1463.
District Court of Appeal of Florida, Third District.
October 12, 1982.
Rehearing Denied January 7, 1983.
*378 Steel, Hector & Davis and Talbot D'Alemberte and Donald M. Middlebrooks, James D. Spaniolo, Miami, for appellant.
Adams & Ward and Robert Ward and James W. Kaufman, Miami, for appellee.
Before HUBBART, C.J., and HENDRY and DANIEL S. PEARSON, JJ.
HUBBART, Chief Judge.
This is an appeal and cross-appeal from a final judgment awarding compensatory damages against a newspaper in a libel action brought in the Circuit Court for the Sixteenth Judicial Circuit in and for Monroe County, Florida.
The central question presented for review is whether a plaintiff [who is neither a public official nor public figure] in a libel action is required under Florida law to establish as an element of his cause of action that the defendant published the alleged false and defamatory statements sued upon with "actual malice" as defined in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) [i.e., either with knowledge of its falsity or with reckless disregard of its truth or falsity] when the alleged false and defamatory statements relate to an event of public or general concern. We hold, in accord with established First Amendment law and the overwhelming weight of authority throughout the country, that under Florida law such a non-public figure plaintiff is not required under any circumstances to make such an "actual malice" showing as an element of his cause of action, it being sufficient if the plaintiff establishes, as here, that the defendant published the alleged false and defamatory statements with negligence [i.e., without reasonable care as to whether the alleged false and defamatory statements were actually true or false].
We, accordingly, reject all contrary contentions, together with other related points, made upon this appeal and cross-appeal, and affirm the final judgment under review. We further certify that our decision herein passes upon a question, stated above, which is of "great public importance," so as to permit further review of this case by the Florida Supreme Court under Article V, Section 3(b)(4) of the Florida Constitution.

I
The facts of this case are as follows. On Monday, November 21, 1977, Monroe County *379 Sheriff's deputies seized an "Old Milwaukee" beer truck containing three tons of marijuana outside Marathon, Florida, in the Florida Keys. Greg Kirstein, a reporter for the defendant Miami Herald, was dispatched from his Key West office to cover this event for his newspaper. In connection with this assignment, Mr. Kirstein spoke on several occasions to various officials from the Monroe County Sheriff's office and learned the details of the marijuana seizure, including the fact that Lillian Fernandez of Key West, Florida, was the licensed owner of the seized beer truck. He further checked with the Florida Department of Motor Vehicles in Tallahassee and confirmed the information that the beer truck was, in fact, licensed to Lillian Fernandez.
Mr. Kirstein, however, continued to make other inquiries concerning the ownership of the subject beer truck. He tracked down the former owner of the truck, Island Leasing Corporation, and the company which had formerly leased the truck from Island Leasing Corp., Universal Brands; this was done by tracing the fleet number of the truck and an expired beverage commission sticker on the truck. Mr. Kirstein had one brief telephone conversation with a person from Island Leasing Corp., and two longer telephone conversations with an official from Universal Brands, the defendant Marvin Kimmel.
Mr. Kimmel stated that his company no longer leased the beer truck, that the people from Island Leasing had told him that they had sold the truck to the plaintiff Aurelio Ane the prior Thursday for $2,750 cash. Mr. Kirstein made no attempt to verify this hearsay information by again contacting Island Leasing; he further was unable to obtain any documentation which would verify such a sale, but, to the contrary, discovered that the licensed, present owner of the truck was Lillian Fernandez of Key West. Moreover, he made no effort to contact Lillian Fernandez.
No other source contacted by Mr. Kirstein implicated the plaintiff Ane in any way with this truck; indeed, Monroe County Sheriff's officials investigating the case specifically told Mr. Kirstein that the plaintiff Ane was not a suspect in the case. A brief background check on the plaintiff Ane revealed him to be a beer distributor in Key West who was considered to be an honest man; efforts to locate Mr. Ane in Key West were unsuccessful as he was out of town at the time. Also Mr. Kirstein traced a decal on the license plate of the beer truck through a tag agency in Miami and discovered that the decal did not belong on the subject license tag, that it properly belonged on a 1964 Chevrolet pick-up truck owned by a man in North Miami, who was in no way connected with the plaintiff Ane.
On Tuesday, November 22, 1977, a news article written by Mr. Kirstein appeared in the Keys local section of the defendant Miami Herald newspaper which was widely circulated in the Florida Keys. The lead paragraph of the article stated that Monroe County Sheriff's officials had reported that a Key West distributor  identified in the fourth paragraph as the plaintiff Ane  was the owner of an "Old Milwaukee" beer truck containing three tons of marijuana which had been seized the day before by the Monroe County Sheriff's office had specifically excluded the plaintiff Ane as a suspect in the case, had named Lillian Fernandez as the licensed owner of the beer truck, and had never identified the plaintiff Ane as the owner of the subject beer truck. The article also repeated in the fourth paragraph the defendant Kimmel's unverified statement that the truck in question had been purchased the Thursday prior thereto by the plaintiff Ane. The article stated as follows:
"TRUCK ADVERTISED BEER: CARRIED MARIJUANA BALES"
"An `Old Milwaukee' beer truck, sold only last Thursday by a Miami firm to a Key West distributor, was confiscated early Monday carrying about three tons of baled marijuana on U.S. 1 in Marathon, Monroe County Sheriff's officials said.

The driver of the truck, 40-year-old William W. Horton, Slip 22, Tropical Marina, Key West, was charged with possession *380 of more than 100 pounds of marijuana and an invalid driver's license. He was being held on $150,000 bond at the sheriff's Marathon sub-station late Monday.
Sheriff's officials promised `a full-scale investigation' and said they have `several other suspects' in the case.

THE LARGE red-and-white truck, which Monday contained bales either wrapped in burlap or packaged in cartons from Colombia, had been purchased Thursday by Aurelio Ane, Key West Distributors Inc. president, according to Marvin Kimmel, president of Miami's Universal Brands Inc." [emphasis added][1]
It is undisputed in this case that the plaintiff Ane had at no time purchased the subject beer truck from Island Leasing, that the defendant Kimmel's unverified and contradicted hearsay information concerning such a sale was entirely inaccurate, and that the plaintiff Ane had no connection whatever with the said beer truck. There is also uncontradicted testimony from the plaintiff Ane that he was personally shamed and humiliated by these admittedly false accusations which appeared in the above-stated news article.
In a follow-up article in the Miami Herald the next day, the correct ownership of the truck was acknowledged, but no effort was made [either then or later after proper written notice was served, see §§ 770.01  .02, Fla. Stat. (1979)] to retract the false statements that the Monroe County Sheriff's office had accused the plaintiff Ane of *381 owning the marijuana-laden truck in question, and that the plaintiff had purchased this truck the Thursday prior to the marijuana seizure.[2]
The plaintiff Ane subsequently brought suit for libel against the defendant Miami Herald and Mr. Marvin Kimmel in the Circuit Court for the Sixteenth Judicial Circuit in and for Monroe County, Florida. The above-cited false statements were alleged, inter alia, as among the libelous statements appearing in the defendant Miami Herald's news article. After appropriate answers were filed and defense motions for summary judgment denied, the case was tried below before a jury. The above facts were established by the evidence as adduced at the trial and motions by all parties for a directed verdict were denied. The court instructed the jury that the plaintiff could recover in his libel action if the greater weight of the evidence showed that the *382 defendants negligently published the false and defamatory statements sued upon. The jury returned a verdict for the plaintiff and awarded $5,000 in compensatory damages against the defendant Miami Herald and $10,000 in compensatory damages against the defendant Marvin Kimmel; no punitive damages were awarded.
The defendant Miami Herald appeals; the plaintiff Aurelio Ane cross-appeals. No appeal has been taken by the defendant Marvin Kimmel.

II
The central contention made by the defendant Miami Herald upon this appeal is that the trial court erred in denying its motion for a directed verdict because the plaintiff Ane failed to establish at trial that the defendant Miami Herald acted with "actual malice" as defined in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in publishing the false and defamatory statements sued upon in the November 22, 1977, news article; it is urged that such a showing of actual malice is an essential element of a libel action under Florida law where, as here, the publication in question relates to an event of public or general concern, to wit: a police investigation of a criminal act. We cannot agree because, in our view, a showing of New York Times "actual malice" is never required where, as here, the defamation plaintiff is a private individual and not a public official or public figure; it is also our view that there was sufficient evidence of journalistic negligence, defamatory falsehood, and actual damages to send this case to the jury.

A
It is well-settled that the free speech and free press guarantees of the First Amendment to the United States Constitution, as made enforceable against the states under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, "require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). This First Amendment rule also applies to a public figure. Curtis Publishing Co. v. Butts, 388 U.S. 130, 162-65, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring, joined by four justices), as further explained in Gertz v. Robert Welch, Inc., 418 U.S. 323, 335-37, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). It does not apply, however, to a private individual who is neither a public official nor public figure. Gertz v. Robert Welch, Inc., 418 U.S. at 342-48, 94 S.Ct. at 3008. As to the latter, a First Amendment rule of negligence obtains which precludes the imposition of "liability without fault" in a defamation action, Gertz v. Robert Welch, Inc., 418 U.S. at 347, 94 S.Ct. at 3010, and requires the private individual plaintiff to produce "evidence of some fault on the part of a defendant publishing defamatory material." Time, Inc. v. Firestone, 424 U.S. 448, 461, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976). At one time the New York Times "actual malice" rule was restated so as to be applicable, regardless of the identity of the plaintiff, to any action for defamatory falsehood where "the utterance involved concerns an issue of public or general concern..." Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296 (1971) (plurality opinion). This reformulation of the New York Times rule, however, has since been receded from and no longer represents good First Amendment law. Gertz v. Robert Welch, Inc., 418 U.S. at 345-47, 94 S.Ct. at 3009.

B
The New York Times line of decisions, as discussed above, represents "unquestionably the greatest victory won by the defendants in the modern history of the law of torts." W. Prosser, Law of Torts § 118 (4th ed. 1971). It has literally revolutionized the *383 law of defamation in Florida and every other jurisdiction in the country.
Prior to the New York Times decision in 1964, Florida tort law followed the common law of defamation. In company with the settled law on this subject throughout the country, Florida has long imposed a strict liability standard in defamation actions requiring the plaintiff merely to prove that the material published was defamatory, that it referred to the plaintiff, and that the plaintiff was damaged thereby [which was presumed if the defamation was libel per se or slander per se]  with various affirmative defenses being recognized, including truth with good motives. See e.g., Hartley & Parker, Inc. v. Copeland, 51 So.2d 789, 791 (Fla. 1951); Layne v. Tribune Co., 108 Fla. 177, 146 So. 234 (1933); Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 (1906); W. Prosser, Law of Torts, § 113 (4th ed. 1971). Florida law had never required proof that the defendant acted negligently  as Gertz v. Robert Welch, Inc., supra and Firestone v. Time, Inc., supra, now require  in publishing the allegedly defamatory material, much less that the defendant acted with New York Times "actual malice." See e.g., Firestone v. Time, Inc., 271 So.2d 745, 747 (Fla. 1972); Barry College v. Hull, 353 So.2d 575, 578 (Fla. 3d DCA 1978).
All of the above Florida law has been changed  correctly we think  by the New York Times line of decisions. Plaintiffs in defamation actions in Florida and throughout the country are now required to prove that the defendant acted negligently in publishing the allegedly false and defamatory material and, in the case of a plaintiff who is a public official or public figure, that the defendant acted with New York Times "actual malice." See e.g., Holter v. WLCY T.V., Inc., 366 So.2d 445, 450-52 (Fla. 2d DCA 1978), cert. denied, 373 So.2d 462 (Fla. 1979). All of these higher standards are, however, not prerequisites of the Florida common law of defamation or Florida constitutional law; they are prerequisites of the First Amendment to the United States Constitution which heretofore did not exist under Florida law. Florida courts, in turn, have consistently sought to follow these federal standards in defamation actions in the post-New York Times era. See e.g., Holter v. WLCY T.V., Inc., supra.
Specifically, as it relates to this case, Florida courts initially followed the reformulation of the New York Times rule as announced in Rosenbloom v. Metromedia, Inc., supra. Firestone v. Time, Inc., 271 So.2d 745 (Fla. 1972); Nigro v. Miami Herald Publishing Co., 262 So.2d 698 (Fla. 3d DCA), cert. denied, 267 So.2d 834 (Fla. 1972). Later, when Rosenbloom was receded from in Gertz v. Robert Welch, Inc., supra, Florida courts ceased following Rosenbloom and instead followed the federal standard of negligence for non-public figures in defamation cases as established in Gertz and subsequently elaborated in Time, Inc. v. Firestone, supra. Karp v. Miami Herald Publishing Co., 359 So.2d 580 (Fla. 3d DCA), appeal dismissed, 365 So.2d 712 (Fla. 1978); Helton v. United Press International, 303 So.2d 650 (Fla. 1st DCA 1974).
It is true that the Florida Supreme Court in Firestone v. Time, Inc., 305 So.2d 172 (Fla. 1974), a post-Gertz decision, did not appear to follow the Gertz standard of negligence in a non-public-figure defamation case, and seemingly reverted to the strict standard of liability applicable at common law in defamation actions, although the Court referred in its decision to "clear and convincing evidence" of negligence on the part of the defendant in the case. Id. at 178. In any event, the United States Supreme Court reversed the Florida Supreme Court for failure to apply, at least, a Gertz standard of negligence liability to the case. Upon remand, the Florida Supreme Court entered an order on the mandate in which it noted that the United States Supreme Court had made no determination as to whether the defendant, [Time, Inc.] was at fault in publishing the subject defamation, vacated the prior Fourth District Court of Appeal decision in the cause, see 279 So.2d 389, and directed the Fourth District Court of Appeal to vacate the trial court judgment previously entered in the plaintiff's *384 favor "for further proceedings in the trial court not inconsistent with the decision by the Supreme Court of the United States in this matter." Firestone v. Time, Inc., 332 So.2d 68 69 (Fla. 1976). It is, therefore, clear that the ultimate decision of the Florida Supreme Court in this litigation adopted, without discussion, the Gertz-Firestone standard of negligence, and no higher standard, as the controlling law in the case which the trial court was to apply upon remand. This result is in perfect accord with the post-Gertz decisions in Florida previously cited; when Rosenbloom died at the federal level, it died in the Florida courts as well.
In this connection, we have not overlooked the defendant Miami Herald's analysis of Florida defamation cases in which it is urged that Florida has adopted, as a matter of state law, the Rosenbloom reformulation of the New York Times rule which, it concedes, has been repudiated at the federal level. We respectfully disagree with that analysis.

1
The central decision relied upon by the defendant Miami Herald is Firestone v. Time, Inc., 271 So.2d 745 (Fla. 1972), a pre-Gertz decision following Rosenbloom v. Metromedia, Inc., supra. This decision, purely and simply, interprets the First Amendment to the United States Constitution in the context of a libel action and does not even mention, much less interpret, Florida's counterpart to the First Amendment, to wit: Article I, Section 4 of the Florida Constitution. The following opening paragraphs from the opinion should dispel all doubt that the issue before the court was whether the First Amendment protected the instant defamatory publication, for if it did not, Florida law clearly imposed strict liability therefor.
"In any case, in this libel action the District Court reversed a judgment in favor of plaintiff-petitioner, concluding that because the petitioner's ex-husband was an heir to the immense Firestone rubber fortune, and because their divorce action itself together with sensational predivorce marital difficulties had received nationwide publicity, the foregoing publication was constitutionally protected under the First Amendment of the United States Constitution as being `an event of great public interest' within the rationale of the so-called `New York Times doctrine.'
I
"The paramount question we must answer, therefore, is whether the publication herein, under the circumstances of its making, is thus constitutionally protected. If it is, then the New York Times standard does apply, viz., assuming a defamatory falsehood, petitioner must prove, with convincing clarity, actual malice, i.e., knowledge of the falsity or a reckless disregard of whether it was false or not. If not constitutionally protected, and again assuming a defamatory falsehood, then the publication herein renders respondent amenable under the Florida common law on the subject, to-wit: that a published defamatory falsehood which is libelous per se, unless otherwise privileged, is actionable absolutely and no malice need be shown  truth being the only defense." Id. at 747. [emphasis added] [footnotes omitted]
The entire discussion in the case centers around various United States Supreme Court decisions interpreting the First Amendment including Rosenbloom v. Metromedia, Inc., supra, which the Court, in turn, follows, but finds inapplicable to the subject publication. Nothing in the opinion indicates that the Court was in any sense interpreting Florida constitutional law.
As the Firestone decision is solely a First Amendment case following the Rosenbloom decision, it no longer represents the law in view of Gertz v. Robert Welch, Inc., supra, which subsequently receded from Rosenbloom. It is a fundamental principle of federal constitutional law that no state court is authorized to interpret any provision of the United States Constitution, including the First Amendment, in a manner which is contrary to United States Supreme *385 Court decisions interpreting the same provision of the United States Constitution. See e.g., Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); Henry v. City of Rock Hill, 376 U.S. 776 84 S.Ct. 1042, 12 L.Ed.2d 79 (1964). Nor can the decision here be revived, as urged, as an interpretation of the Florida Constitution according greater constitutional protection for defamation defendants than that afforded by the First Amendment, unless one is willing, as we are not, to rewrite the Court's entire opinion.

2
The defendant Miami Herald also relies on various other Florida decisions to wit: Gibson v. Maloney, 231 So.2d 823 (Fla. 1970); Abram v. Odham, 89 So.2d 334 (Fla. 1956); Jacova v. Southern Radio & Television Co., 83 So.2d 34 (Fla. 1955); Coogler v. Rhodes, 38 Fla. 240, 21 So. 109 (1897); Nigro v. Miami Herald Publishing Co., 262 So.2d 698 (Fla. 3d DCA), cert. denied, 267 So.2d 834 (Fla. 1972). We do not read any of these cases, however, to announce in any sense a Rosenbloom rule.
The Gibson and Abram cases stand for the proposition, inapplicable here, that a defamation defendant has a qualified privilege, which he must raise as an affirmative defense, to publish a "fair comment" on or "fair account" of a public matter involving a public figure; in turn, "[t]he great majority of American courts hold that no comment can be fair if it is based on misstatements of fact." Miami Herald Publishing Co. v. Brautigam, 127 So.2d 718, 723 (Fla. 3d DCA), cert. denied, 135 So.2d 741 (Fla. 1961), cert. denied, 369 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786 (1962). The Jacova case involves an invasion of privacy suit and Coogler v. Rhodes, 38 Fla. 240, 21 So.2d 109 (1897), is an early defamation case on qualified privilege; neither case adopts or even discusses a Rosenbloom rule. Finally, Nigro is a pre-Gertz First Amendment defamation case following Rosenbloom which was not based in any way on Florida law; in view of Gertz which recedes from Rosenbloom, Nigro no longer represents good First Amendment law today.
In sum, none of the above cases can be fairly read, as urged, to adopt as a matter of state law the Rosenbloom reformulation of the New York Times rule, and the attempt to do so, in our view, stands Florida defamation law on its head.

C
The prevailing First Amendment and Florida law, as discussed above, is supported by the overwhelming weight of authority in the country on this subject which has followed a Gertz-Firestone standard of negligence in defamation actions where the plaintiff is neither a public official nor a public figure.[3] This majority view has, in *386 turn, been adopted by the American Law Institute's Restatement of Torts. Restatement (2d) of Torts § 580B (1977).[4] The established law here is also fully supported by sound constitutional considerations which are more fully discussed in Gertz v. Robert Welch, Inc., 418 U.S. at 339-48, 94 S.Ct. at 3006.
Beyond that, we think the prevailing law here is both sensible and fair. On the one hand, we recognize that the constitutional free press and free speech guarantees at stake in this area of law are absolute preconditions to a free society and deserve the most vigilant and wide-ranging protection. See e.g., United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1937). Indeed, these freedoms seem particularly precious and essential to our democracy when viewed against the backdrop of an age where such liberty has been so ruthlessly suppressed on such a wide-spread scale by the rise of totalitarianism, both on the left and the right, in many parts of the world. We, therefore, strongly share the view that:
"The public has an interest in the free dissemination of news. This interest was well stated by that great American, Thomas Jefferson, in the following words: `The only security of all is in a free press. The force of public opinion cannot be resisted, when permitted freely to be expressed. The agitation it produces must be submitted to. It is necessary to keep the waters pure. No government ought to be without censors: *387 and where the press is free no one ever will.' It is true that there are occasions when the freedom of the press is abused, just as some individuals abuse their right to speak and write their sentiments freely. But, in discussing this problem, Thomas Jefferson said: `Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true, than in that of the press. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away, to injure the vigor of those yielding the proper fruits.'" Ross v. Gore, 48 So.2d 412, 415 (Fla. 1950). (emphasis in original).
Moreover, a free and vigorous press, in spite of crass and politically motivated attacks upon it, has performed important service over the years to the cause of responsible, democratic government, as shown, for example, by its service to the country in uncovering the Watergate scandals and in publishing the Pentagon Papers. In addition, the defendant Miami Herald, itself a nationally respected, Pulitizer prize-winning newspaper, has produced journalistic work, often of the highest excellence, to sustain an enlightened, informed citizenry and to encourage honest, competent government. Beyond that, the news media  although hardly monolithic in any sense  is one of few independent power sources in the country which can "without fear or favor" effectively expose egregious wrongdoing committed by powerful public and private institutions in this country. We dare not censor a free press if we wish to remain truly a free and open society.
Still, we cannot help reflecting that the defamation action, properly limited, also plays an important role in a free society as it represents the individual's sole remedy against the occasional excesses of the print and electronic media which often have vast resources to inflict untoward damage upon an individual. Surely, a decent, open society cannot, in the name of press and speech freedom, so thoroughly undermine this remedy as to render it useless to those people who have been damaged by a defamatory falsehood negligently uttered in the mass media and have not in any way sought the public limelight.[5] This small modicum of privacy for the average person deserves, in our view, protection under the existing law, particularly in a country such as ours which is dedicated to the preservation of the free individual. Moreover, this conclusion takes on added strength in view of the fact that the price for protecting such limited privacy under our law has not, so far as we are aware, exacted a sacrifice of, or even posed a significant threat to, the free flow of information and ideas in this country or hindered free, robust debate on public issues upon which our democracy so vitally depends. It therefore seems neither sensible nor fair to push the parameters of free press and free speech to such an extent, as urged here, that we needlessly plow under other important individual rights.
In this connection, Judge Learned Hand has aptly noted:
"[Liberty] is not the ruthless, the unbridled will; it is not freedom to do as one likes. That is the denial of liberty, and leads straight to its overthrow. A society in which men recognize no check upon their freedom soon becomes a society where freedom is the possession of only a savage few; as we have learned to our sorrow." L. Hand, The Spirit of Liberty 190 (Dillard 3d ed. 1974).
It accordingly follows that one may strongly endorse Thomas Jefferson's libertarian views on a free press, as we surely do, without at the same time gutting the average person's right to protect his privacy *388 against negligent libel through the defamation action  a common law remedy which Jefferson, as an astute common law scholar, never even remotely suggested that we alter or abolish.[6] Indeed, it is a basic tenet of democracy that all power  public as well as private  must be subject to effective limitation lest the power be abused.[7] In our judgment, the primary limitation against the excesses of the power of the mass media  a power which by any standard is considerable in this country[8]  is the defamation action. We think the established law sensibly declines to erode that action, as urged, because to do so would be to undermine great principles of ordered liberty.

D
Turning to the instant case, we have no difficulty in concluding that the trial court properly denied the defendant Miami Herald's motion for directed verdict in this case. Without dispute, the plaintiff Ane was a private individual who was neither a public official nor a public figure. Under the applicable First Amendment and Florida law, he was entitled to recover in his libel action if he established at trial that the defendant Miami Herald published (1) false and defamatory statements of and concerning him, (2) without reasonable care as to whether those statements were true or false, (3) resulting in actual damage to himself. Clearly, the plaintiff Ane produced enough evidence at trial to survive a defense motion for directed verdict and to have a jury consider his case under proper instructions.

1
First, it is plain that the defendant Miami Herald published false and defamatory *389 statements of and concerning the plaintiff Ane in its November 22, 1977 news article. The article falsely stated in its lead paragraph that Monroe County Sheriff's officials had reported that a Key West distributor  identified in the fourth paragraph as the plaintiff Ane  was, in effect, the owner of a recently purchased "Old Milwaukee" beer truck containing three tons of marijuana which had been seized the day before by the Monroe County Sheriff's office. The truth was, however, that Monroe County Sheriff's officials had never identified the plaintiff Ane as the owner of the marijuana-laden beer truck which, admittedly, they had seized the day before; on the contrary, these officials had stated that Lillian Fernandez was the licensed owner of the seized beer truck, and that the plaintiff Ane was not even a suspect in the case. In addition, the fourth paragraph of the article repeats, without naming the hearsay source, the defendant Kimmel's admittedly false statement that the plaintiff Ane had purchased the marijuana-laden beer truck the Thursday prior to the police seizure of the said truck; without dispute, the plaintiff Ane had no connection whatever with this truck.
These concededly false statements of and concerning the plaintiff were susceptible, in our view, to a defamatory meaning. A reasonable person could have interpreted these statements to mean that the plaintiff Ane was heavily implicated in a serious drug offense as the owner of a beer truck containing three tons of marijuana which had been seized by the police. "The language of the publication declared upon should not be interpreted by extremes, but should be `construed as the common mind would normally understand it.'" Walsh v. Miami Herald Publishing Co., 80 So.2d 669, 671 (Fla. 1955). Surely, the average person upon reading these statements could reasonably have concluded that the plaintiff Ane was implicated in the crime of illegal possession of marijuana.
The defendant Miami Herald argues that another reasonable construction could be placed on these statements, namely, that the plaintiff Ane owned a beer truck which was stopped by police while being operated by another person and found to contain an illegal drug, but that the plaintiff Ane did not actually possess the marijuana when the truck was stopped and, therefore, was entirely innocent of any wrongdoing. We think that is a bit strained and not at all what the average person would have thought. In any event, the law is well-settled that where a publication is susceptible of two reasonable interpretations, one of which is defamatory, the issue of whether the publication was defamatory becomes one of fact and must be submitted to a jury, as here, for a fact-finding determination. Belli v. Orlando Daily Newspapers, Inc., 389 F.2d 579 (5th Cir.1967). As such, the plaintiff Ane produced sufficient evidence here from which a jury could have reasonably concluded that the defendant Miami Herald published false and defamatory statements of and concerning him.

2
Second, it is equally plain that sufficient evidence was presented in the instant case from which a jury could have reasonably concluded that the defendant Miami Herald, through its reporter Greg Kirstein, negligently published the false and defamatory statements in this case, that is, that it published these statements without reasonable care as to whether such statements were true or false.
The only information Mr. Kirstein had which connected the plaintiff Ane to the subject beer truck was the hearsay statement of the defendant Kimmel, to wit, that the people from Island Leasing had told him [Kimmel] that the plaintiff Ane had purchased the truck from Island Leasing the Thursday prior to the marijuana seizure. Mr. Kirstein made no attempt to verify this hearsay information by again contacting the people from Island Leasing, the purported seller in this transaction; moreover, he was unable to obtain any documentation for this sale, but, to the contrary, discovered from two independent *390 sources [the police and the Florida Department of Motor Vehicles] that the licensed owner of the truck was Lillian Fernandez. The Monroe County Sheriff's office also flatly told Mr. Kirstein that the plaintiff Ane was not a suspect in the case and at no time identified the plaintiff Ane as the owner of the subject beer truck.
Yet, Mr. Kirstein wrote in the lead paragraph of the subject news article that Monroe County Sheriff's officials had reported that the plaintiff Ane had recently purchased the subject beer truck the Thursday prior to the marijuana seizure; he also repeated in the fourth paragraph Mr. Kimmel's unverified, contradicted hearsay statement concerning the purported sale of the truck. Both statements were false and surely he should have known better, given the information he had before him. We deal, in our view, with a clear case of journalistic negligence, the evidence of which in this case was more than ample to go to the jury for final resolution. See e.g., Tiny's Liquors, Inc. v. Davis, 353 So.2d 168, 169 (Fla. 3d DCA 1977).

3
Third, the subject false and defamatory statements herein also caused, according to the uncontradicted testimony of the plaintiff Ane, considerable mental anguish and humiliation to the plaintiff Ane. This is understandable as most people, for good reason, are apt to be tremendously shaken by seeing their good names denigrated in the media. Under Florida law, a false and defamatory statement accusing someone of a crime, as here, is considered to be per se actionable without proof of special damage. Miami Herald Publishing Co. v. Brautigam, 127 So.2d 718, 722 (Fla. 3d DCA), cert. denied, 135 So.2d 741 (Fla. 1961), cert. denied, 379 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786 (1962). The First Amendment, however, requires proof of some actual damage before compensatory damages can be awarded in a defamation action involving negligence; one element of such damages may be, as here, mental anguish and personal humiliation. Gertz v. Robert Welch, Inc., 418 U.S. at 348-50, 94 S.Ct. at 3011. We think, therefore, that there was sufficient evidence of mental suffering in this case to go to the jury for an assessment of damages, and that the $5,000 awarded by the jury for such suffering was well within the reasonable range of permissible compensation allowed under our law.
In all, the trial court was eminently correct in denying the defendant Miami Herald's motion for directed verdict in this case. We reject all contrary contentions made upon this appeal by the defendant Miami Herald.

III
Finally, we find no merit in the plaintiff Ane's cross-appeal attacking the jury verdict for failing to assess punitive damages against the defendant Miami Herald and, by implication, the trial court's denial of its motion for directed verdict. It seems clear that there was sufficient evidence for the jury to conclude, as it did, that the defendant Miami Herald acted negligently, but not with actual malice, in publishing the defamatory matter herein. The fact remains that the first newspaper article did contain a statement, albeit in the eighth paragraph of the article, which correctly reported that the Monroe County Sheriff's office had identified Lillian Fernandez as the owner of the truck; moreover, a follow-up article appearing the next day acknowledged Fernandez's ownership of the beer truck and stated that the plaintiff Ane was not the owner thereof. Based on these facts, the jury obviously felt that the defendant Miami Herald had exercised some degree of responsibility here, and, consequently, was unwilling to award punitive damages. We are not disposed to upset this finding. See e.g., Shaw v. Shaw, 334 So.2d 13, 16 (Fla. 1976).
Based on the foregoing reasons, the final judgment under review is in all respects
Affirmed.
DANIEL S. PEARSON, specially concurring.
I concur in Judge Hubbart's thorough and excellent analysis. While for the reasons *391 set forth in From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981), I would place little or no reliance on the precedential importance of Karp v. Miami Herald Publishing Co., supra, and Helton v. United Press International, supra, I think Judge Hubbart is, nonetheless, perfectly correct in his observation that the Florida Supreme Court in the post-Gertz proceedings of Firestone v. Time, Inc. adopted, without discussion, a negligence standard of liability.
The basis upon which the United States Supreme Court majority vacated the judgment in Firestone v. Time, Inc., 305 So.2d 172 (Fla. 1974), was its conclusion that no fact-finder had made a conscious determination of fault and its unwillingless to equate the Florida Supreme Court's determination that there was sufficient  indeed, clear and convincing  evidence of negligence, with the requisite constitutional finding of fault. While it is certainly arguable that a pronouncement that there was sufficient evidence to support a finding differs from the actual finding, the fact remains (and for present purposes, the critical fact) that the evidence which the Florida Supreme Court declared to be sufficient was evidence of negligence. Whether, as expressed in the dissenting views of Justice White, 424 U.S. at 481, 96 S.Ct. at 978, 47 L.Ed.2d at 178, and Justice Marshall, 424 U.S. at 484, 96 S.Ct. at 980, 47 L.Ed.2d at 180, the Florida Supreme Court's determination that there was clear and convincing evidence of negligence was tantamount to a finding of fault, or, as in the view of the United States Supreme Court majority, that determination was not a finding, is immaterial to the present inquiry. What is material is that with Gertz v. Welch before it (and as Justice White points out, "referred to ... by name"), the Florida Supreme Court pointed out that negligence had been established, to me a clear indication that no higher standard of fault was required. I think that this confirms Judge Hubbart's conclusion that the Florida Supreme Court, post-Gertz, adopted a negligence standard of liability for a publisher of a defamatory falsehood made in a matter of public concern which injures a non-public figure.
HENDRY, Judge (dissenting).
Although I do not treat lightly the well written opinions of my colleagues, arrived at after long and serious consideration, I must dissent.
It is my opinion that the Florida supreme court adopted as state precedent the New York Times "actual malice" standard for publications relating to events of public or general concern in Firestone v. Time, Inc., 271 So.2d 745 (Fla. 1972) [cited hereinafter as Firestone I], after remand, 305 So.2d 172 (Fla. 1974) [cited hereinafter as Firestone II], reversed on other grounds, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Furthermore, to the extent this precedent is in doubt, I would use the opportunity this case provides to adopt a standard requiring private individuals who bring libel actions, arising from news reports of general or public interest, to prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of the truth.
A brief review of the chronology of federal and state defamation decisions supports my belief that Florida has already adopted the actual malice standard of New York Times.
In the landmark case New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court first gave constitutional protection to concededly false and defamatory news reports. The court ruled that a public official could not recover damages for a defamatory falsehood relating to his official conduct absent proof that the statement was made with actual malice  "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80, 84 S.Ct. at 725, 11 L.Ed.2d at 706. The Court later extended the New York Times privilege to media comments on matters of public interest concerning "public figures" in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, *392 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring, joined by four other justices).
Justice Brennan, joined by two others on the Court, subsequently delivered a plurality opinion in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), that the "actual malice" standard of liability protected media coverage of events of public or general concern, even where the libeled individual was not a public figure or official. The first amendment, Justice Brennan observed, compelled the courts to focus upon an event's public importance rather than the notoriety or official position of the individuals involved.
The Rosenbloom plurality opinion was repudiated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); a majority of the Court felt that Justice Brennan's focus upon the character of the event, rather than the status of the persons involved, protected media defendants to too great a degree. Gertz held that the First Amendment required no more than proof of mere negligence to hold the press accountable when it libeled a private individual.
However, when Gertz was handed down, the Florida supreme court had already decided Firestone I and embraced the Rosenbloom plurality view. Firestone I held that an inaccurate news report regarding a divorce was not constitutionally protected by the actual malice standard of liability only because the divorce was not a matter of real public or general concern. Firestone I extensively discussed the concept of "matters of public or general concern" and reached the following conclusion:
[I]t can be broadly said that matters of real public or general concern are those which invoke common and predominant public activity, participation or indulgence, and cogitation, study and debate; and they include such matters as sporting events, the performing and fine arts, morality and religion, the sciences, and matters relating generally to the health, wellbeing and general comfort of the public as a whole. Accordingly, news items or featured articles or commentaries by communications media relating to these matters are and should be constitutionally protected notwithstanding that obscure or prominent individuals may be caught up in the current and regretfully defamed.

Firestone I at 749 (footnotes omitted, emphasis supplied). This conclusion led in turn to adoption of the following test, which coincides with the public issue test of Rosenbloom:
[W]e think that as a workable test the question is whether there is a logical relationship between the reported activities of the prominent person or between the subject matter of the conduct, occasion or event reported or recorded, and the real concern of the public.
Id. at 751.
Thus, the court in Firestone I established in Florida an actual malice standard for defamation suits brought by private individuals involved in "matters of public or general concern." Accord Nigro v. Miami Herald Publishing Co., 262 So.2d 698 (Fla. 3d DCA), cert. denied, 267 So.2d 834 (Fla. 1972) (newspaper articles indicating that plaintiffs were members of the Mafia were constitutionally privileged since law enforcement actions and grand jury inquiries directed to acts or suspected organized crime activities fell within the classification of an event of great public interest a la Rosenbloom). In my view, the news report at issue in this case involved matters of public concern as defined in Firestone I. The crucial question, therefore, is whether Firestone I is still the law in Florida.
By its terms, Gertz merely refused to compel state acceptance of the actual malice standard in private actor/public event cases, leaving the choice open to each state:
[W]e conclude that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual... . We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of *393 defamatory falsehood injurious to a private individual.
Gertz, 418 U.S. at 345-46, 94 S.Ct. at 3009, 41 L.Ed.2d at 809 (emphasis supplied). Whether the Florida standard of liability is mere negligence or actual malice is, therefore, a matter of Florida law, and the latest statement of the Florida standard is found in Firestone I.
We need not determine whether Firestone I would be binding precedent had its rendition originally been compelled by a federal Supreme Court decision itself subsequently reversed. For in fact, the Rosenbloom plurality opinion never achieved precedential weight[1] and thus did not represent a federal mandate to the Florida supreme court. Consequently, Firestone I was neither "explained" by Rosenbloom nor undermined by Gertz. What is important is that in Firestone I the Florida supreme court adopted the actual malice test for this type of libel action and has not expressly disavowed that standard, despite the United States Supreme Court's opinion in Gertz. And, since Gertz in no way precludes use of the actual malice standard enunciated in Firestone I, and no pre- or post-Gertz Florida supreme court decisions have dislodged Florida from the Firestone I philosophy, the latter represents valid Florida law.[2]
That this conclusion is correct is reinforced by the fact that the Florida supreme court was confronted with Firestone II after the United States Supreme Court rendered the Gertz decision and did not repudiate or question the standard adopted in Firestone I, although Firestone II was the appropriate time for the Florida supreme court to abandon Firestone I if adoption of a new standard was intended.[3]
*394 Even were I to agree with the majority's view that Firestone I was "reversed" by Gertz, I would take this opportunity to adopt as Florida law the principle that actual malice must be established by all plaintiffs in "public event" libel cases.
Article I, Section 4 of the Florida Constitution secures the right to speak, write and publish. The Florida supreme court has long and consistently recognized the vital role of a free press in our society and applied a qualified media privilege to matters of public concern.
Beginning in the 1930's, the Florida supreme court, in recognition of the unique function of journalism and the reality that reporting errors are inevitable, relaxed the harsh common law doctrine of strict liability by granting a qualified privilege to publications reporting incidents of public interest. As a consequence, the media was not liable for publication of false statements in the absence of affirmative proof of express malice or abuse of this qualified privilege. See, e.g., Ross v. Gore, 48 So.2d 412, 415 (Fla. 1950) (the preservation of democracy depends on rapid news dissemination to the public and the press' function of policing society by reporting events should not be unreasonably restrained); Cooper v. Miami Herald Publishing Co., 159 Fla. 296, 31 So.2d 382 (1947) (newspaper's responsibility to supply world-wide news coverage requires special consideration); Layne v. Tribune Co., 108 Fla. 177, 146 So. 234 (1933) (judicial recognition that early common law did not take into account the complexities of the modern daily newspapers). See also, White v. Fletcher, 90 So.2d 129 (Fla. 1956); Abram v. Odham, 89 So.2d 334 (Fla. 1956); Leonard v. Wilson, 150 Fla. 503, 8 So.2d 12 (1942). Florida's recognition and media privilege preceded, by at least a decade, the United States Supreme Court's similar adoption in New York Times.
More recently, the Florida supreme court in Gibson v. Maloney, 231 So.2d 823 (Fla. 1970), promulgated a qualified privilege of "fair comment on a public matter," focusing on the subject matter of the communication rather than the status of the defamed individual. Id. at 826. Relying on its prior holding in Jacova v. Southern Radio and Television Co., 83 So.2d 34 (Fla. 1955), and New York Times, the Gibson court concluded that an actual malice standard should protect the qualified privilege to comment on public matters. Gibson, 231 So.2d at 826. See also Nigro v. Miami Miami Herald Publishing Co., supra; Bishop v. Wometco Enterprises, Inc., 235 So.2d 759 (Fla. 3d DCA), cert. denied, 240 So.2d 813 (Fla. 1970).
As stated above, in Firestone I the Florida supreme court concluded that publications about matters of public concern should be constitutionally protected regardless of *395 whether they relate to prominent or obscure individuals. Accordingly, I think a long line of Florida decisions creates a foundation for the application of an actual malice standard in this type of news report.
In my opinion, the majority's holding severely threatens media freedom. Error by a rigorous press is inevitable, and by permitting financial sanctions to be imposed solely for negligent errors, the majority's decision will inevitably reduce the flow of vital information and ideas to the public. As a consequence of this decision, many smaller newspapers unable or unwilling to defend against libel litigation will be apt to self-censor, resulting in narrower coverage of newsworthy events. I consider this a very real and substantial danger which far outweighs the occasional harm caused by the type of careless errors which occurred in this case.
I do not doubt that the plaintiff below was harmed by the carelessness of the Herald. Yet the courts have continuously admonished the public that our society must tolerate occasional reporting errors as the price of preserving a truly free press. The chilling effect of the majority's view can not be overlooked: without the benefit of the hindsight which a record on appeal supplies, an editor will now often have to suppress printing a story having public import merely because he is unsure of all the facts. As a practical matter, imposing a simple negligence standard on the press, for stories of admitted public significance, is a grave step which threatens the core of our asserted commitment to "uninhibited, robust, and wide-open" debate on public issues. New York Times, 376 U.S. at 270, 84 S.Ct. at 720, 11 L.Ed.2d at 701. As Justice Douglas noted in his dissent in Gertz, "it may well be the reasonable man who refrains from speaking." 418 U.S. at 360, 94 S.Ct. at 3017, 41 L.Ed.2d at 817.
Defamation cases brought by private plaintiffs illustrate the type of information which may fail to reach the public if a simple negligence standard is imposed in "public event" cases, since such information, even when its sources appear reliable and accurate, can be neither verified before publication nor proved accurate in court: drug distribution, El Meson Espanol v. NYM Corp., 389 F. Supp. 357 (S.D.N.Y. 1974), aff'd, 521 F.2d 737 (2d Cir.1975); toy safety, F & J Enterprises, Inc. v. CBS, 373 F. Supp. 292 (N.D.Ohio 1974); organized crime, Time, Inc. v. Regano, 427 F.2d 219 (5th Cir.1970); business kick-backs, Lawlor v. Gallagher Presidents' Report, Inc., 394 F. Supp. 721 (S.D.N.Y. 1975); and the flammability of baby cribs, ABC v. Smith Cabinet Mfg. Co., 160 Ind. App. 360, 312 N.E.2d 85 (Ind. Ct. App. 1974).
Such an impediment to the free flow of information to the public is unnecessary since the actual malice rule allows recovery for intentional or reckless defamation, without precipitating self-censorship by the press. The actual malice standard permits freedom of speech and press to dominate, but not eradicate, the individual interest of reputation and privacy. An additional advantage of this standard is its certainty  reports on matters of public concern would be protected and therefore could be published with relative immunity while individuals, whether public or private, would be shielded from gross media responsibility.
In summary, I would adopt an actual malice standard for private individuals in defamation actions arising from news reports of general or public concern. This standard provides both the courts and the media with certainty as to those matters appropriate for public comment while still allowing recovery for the knowing or reckless disregard of individual rights. Accordingly, I would reverse the judgment below and remand to the trial court to properly instruct the jury in that regard.
NOTES
[1] The balance of the article appearing in the November 22, 1977, newspaper reads as follows:

"Kimmel's firm formerly leased the 1970 Chevrolet truck from Miami's Island Leasing, but Kimmel said Island Leasing officials told him Ane bought the confiscated truck and a similar vehicle bearing the Schlitz beer trademark for $2,750 cash each last week.
`He (Ane) told us the trucks would be used for spare trucks to haul beer in Key West,' Kimmel said.
Ane could not be reached for comment Monday.
ALTHOUGH KIMMEL said Ane purchased the trucks, both sheriff's officials and state Motor Vehicle Department officials said the truck's plate was registered to another Key West resident, Lillian Fernandez, 2718 Harris Ave.
Sheriff's officials said they did not know whether Fernandez is involved in the case. She could not be reached for comment Monday.
`It may be that the truck's changed hands two or three times recently. We're just starting (the investigation),' Detective Joe Valdes said of the confusion over the truck's ownership. `We find a lot of this in these cases.'
Adding more confusion to the case was a registration sticker pasted on the beer truck's license plate that did not coincide with Dade County Auto Tag Division records for that plate. A division spokeswoman said the sticker found on the beer truck rightfully belonged on a 1964 Chevrolet pick-up truck owned by a Miami man.
`THAT STICKER doesn't belong on that tag,' Monroe County Sheriff William Freeman said.
The truck also bears a state beverage license registered to Universal Brands, which expired Sept. 30, according to state beverage officials. State officials said that license has been renewed but could not determine who now owned it.
`Somebody forgot to scrape the sticker off,' Universal's Kimmel said. `It's not one of ours and you can rest assured that driver (Horton) is not on our payroll.'
Sheriff's officials said they had received confidential information that a beer truck might be carrying marijuana up the Keys and had officers patroling U.S. 1 Sunday night.
THE CONFISCATED truck was northbound when stopped in Marathon near 110th Street shortly after midnight by Deputies Jack Sweeting and Carl Bailey, according to Detective Tom Allen.
`We never had seen that kind of beer truck before,' Allen said. `Then when we checked the driver he had an operator's license rather than a chauffeur's license.'"
"`While the officers were looking over the truck, they noticed a side door cracked,' Allen added. `The crack let an odor out.'
The truck's contents, valued approximately at $1.5 million wholesale in Miami, were all marked with red ink listing each bale's approximate weight in kilograms. Some were boxed in cartons reading `Carton de Colombia, Biquilla, Col.' (Columbia)."
A photograph of the confiscated beer truck accompanied the article with this caption underneath the picture:
"Confiscated Beer Truck Was Unloaded in Key West . .. deputies said three tons of marijuana was inside."
[2] This article appeared on November 23, 1977, in the Keys local section of the Miami Herald distributed in the Florida Keys. The article stated as follows:

"WOMAN OWNS POT-LADEN BEER TRUCK"
"Ownership of a marijuana-laden beer truck, confiscated by Monroe County Sheriff's officials in Marathon Monday, has been traced to a Key West woman who bought the vehicle last week in Miami, Sheriff's Detective Joe Valdes said Tuesday.
The truck, which contained more than three tons of marijuana, had been purchased Thursday from Island Leasing Corp., Miami, by Lillian M. Fernandez, 2718 Harris Ave.
FERNANDEZ IS the wife of Key West boat yard owner Mike Brito who lives at 2718 Harris, according to Artistides Brito, Brito's son and vice president of the family boat yard.
Artistides Brito said Fernandez currently lives in Miami. Mike Brito could not be reached for comment.
Police and a Miami beer distributor said Tuesday that Aurelio (Porky) Ane, president of Key West Distributors, Inc., was not involved in the purchase of the truck. They blamed earlier reports of his involvement on a `misunderstanding.'
Ane's firm distributes Old Milwaukee beer in Key West. Old Milwaukee is the trademark painted on the confiscated truck.
VALDES, HEADING investigation of the case, said Fernandez and an unknown Cuban male bought the confiscated truck and another beer truck from Island Leasing for $5,550. They paid Island Leasing Operations Manager Joe Ross in cash, he added.
The trucks were part of Island Leasing's surplus fleet.
Ross said the unknown Cuban male first came to Island Leasing two weeks ago and inquired about purchasing trucks. The man returned last Wednesday, Ross said, leaving a $5,000 downpayment for the two vehicles.
Fernandez then called Ross last Thursday, he said, identifying herself as `the wife of the man that bought the trucks.'
Along with the Cuban male; a man she told Ross was her father; and a third male, Fernandez appeared at Island Leasing Thursday and gave him another $550, Ross said.
"`SHE'S (Fernandez is) the one that picked the trucks up and came in and payed [sic] for `em,' Ross said. `There were four people  They just walked in and said `We want to buy some trucks.' I showed them where they were parked and they said `We'll take these two.'
Fernandez and the trio departed after the trucks' titles were put in her name, he added.
`This is just a plain, everyday deal,' Ross said, `We sold `em just like we would to you. I never saw her (Fernandez) but once in my life.'
Marvin Kimmel, president of Miami's Universal Brands, Inc., which formerly leased the trucks, had said Monday that Island Leasing officials told him the trucks were sold to Ane.
Kimmel said Tuesday, however, that a `misunderstanding' occurred and that Island Leasing personnel were led to believe it was Ane who purchased the trucks.
ANE SAID Tuesday he has previously purchased trucks from Island Leasing but not recently. He also said, however, that his employes are aware the Miami firm sells trucks.
`Ross knew the trucks weren't for me,' Ane said. He added that one of his employes might have falsely represented Ane's firm when purchasing the trucks, thus leading Island Leasing officials to believe the vehicles were for Ane.
`Ross also said Ane was `in no way involved in this thing.'
`Somebody might have surmised that (Ane's involvement),' Ross said, `because it involved Key West and Porky (Ane) is the Old Milwaukee distributor in Key West.'
ROSS SAID he did not tell Kimmel or anyone else at Universal Brands that Ane bought the trucks.
Valdes said Fernandez's whereabouts are unknown but said she will be questioned once police find her.
The driver of the confiscated truck, William W. Horton, 40, remained jailed in Key West Tuesday."
[3] Seventeen (17) states and the District of Columbia have expressly adopted the Gertz standard of negligence in defamation actions similar to the instant case as a matter of state law: ARIZONA: Peagler v. Phoenix Newspapers, Inc., 114 Ariz. 309, 560 P.2d 1216 (1977); ARKANSAS: Dodrill v. Arkansas Democrat Co., 265 Ark. 628, 590 S.W.2d 340 (1979), cert. denied, 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980); DISTRICT OF COLUMBIA: Phillips v. Evening Star Newspaper Co., 424 A.2d 78 (D.C. 1980), cert. denied, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); HAWAII: Cahill v. Hawaiian Paradise Park Corp., 56 Hawaii 522, 543 P.2d 1356 (1975); ILLINOIS: Troman v. Wood, 62 Ill.2d 184, 340 N.E.2d 292 (1975); KANSAS: Gobin v. Globe Publishing Co., 216 Kan. 223, 531 P.2d 76 (1975); LOUISIANA: Wilson v. Capital City Press, 315 So.2d 393 (Ct.App.), cert. denied, specifically approving decision, 320 So.2d 203 (La. 1975); MARYLAND: Jacron Sales Co. v. Sindorf, 276 Md. 580, 350 A.2d 688 (1976); MASSACHUSETTS: Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 330 N.E.2d 161 (1975); MONTANA: Madison v. Yunker, 589 P.2d 126 (Mont. 1978); OHIO: Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co., 43 Ohio App.2d 105, 334 N.E.2d 494 (Ct.App. 1974), cert. denied, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); OKLAHOMA: Martin v. Griffin Television, Inc., 549 P.2d 85 (Okl. 1976); SOUTH CAROLINA: Jones v. Sun Publishing Co., S.C., 292 S.E.2d 23 (1982); TENNESSEE: Memphis Publishing Co. v. Nichols, 569 S.W.2d 412 (Tenn. 1978); TEXAS: Foster v. Laredo Newspapers, Inc., 541 S.W.2d 809 (Tex. 1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); UTAH: Seegmiller v. KSL, Inc., 626 P.2d 968 (Utah 1981); WASHINGTON: Taskett v. King Broadcasting Co., 86 Wash.2d 439, 546 P.2d 81 (1976); WISCONSIN: Denny v. Mertz, 106 Wis.2d 636, 318 N.W.2d 141 (1982).

Eight (8) states have, like Florida, assumed without discussion, that Gertz represents the law of the state, and have, accordingly, applied the Gertz standard of negligence in defamation actions similar to the instant case: ALABAMA: Browning v. Birmingham News, 348 So.2d 455 (Ala. 1977); CONNECTICUT: Corbett v. Register Publishing Co., 33 Conn.Sup. 4, 356 A.2d 472 (Super.Ct. 1975); GEORGIA: Williams v. Trust Co. of Georgia, 140 Ga. App. 49, 230 S.E.2d 45 (Ct.App. 1976); Savannah News-Press Div. v. Whetsell, 149 Ga. App. 233, 254 S.E.2d 151 (Ct.App. 1979); IDAHO: Bandelin v. Pietsch, 98 Idaho 337, 563 P.2d 395. cert. denied, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977); OREGON: Wheeler v. Green, 286 Or. 99, 593 P.2d 777 (1979); RHODE ISLAND: DeCarvalho v. daSilva, 414 A.2d 806 (R.I. 1980); VERMONT: Colombo v. Times-Argus Ass'n., 135 Vt. 454, 380 A.2d 80 (1977); WYOMING: Adams v. Frontier Broadcasting Co., 555 P.2d 556 (Wyo. 1976).
Only four (4) states have adopted the Rosenbloom standard as a matter of state law: CALIFORNIA: Rollenhagen v. City of Orange, 116 Cal. App.3d 414, 172 Cal. Rptr. 49 (Ct.App. 1981), but cf., Widener v. Pacific Gas & Electric Co., 75 Cal. App.3d 415, 142 Cal. Rptr. 304 (Ct.App. 1977), cert. denied, 436 U.S. 918, 98 S.Ct. 2265, 56 L.Ed.2d 759 (1978); COLORADO: Walker v. Colorado Springs Sun, Inc., 538 P.2d 450 (Colo.), cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); INDIANA: Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc., 162 Ind. App. 671, 321 N.E.2d 580 (Ct.App. 1974), cert. denied, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); MICHIGAN: Peisner v. Detroit Free Press, Inc., 82 Mich. App. 153, 266 N.W.2d 693 (Ct.App. 1978).
Moreover, in three (3) cases, federal courts have interpreted state law as having adopted Gertz: MISSISSIPPI: Brewer v. Memphis Publishing Co., 626 F.2d 1238, 1247 (5th Cir.1980), cert. denied, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981) (applying Mississippi law); PENNSYLVANIA: Mathis v. Philadelphia Newspapers, Inc., 455 F. Supp. 406 (E.D.Pa. 1978) (applying Pennsylvania law); VIRGINIA: Mills v. Kingsport Times-News, 475 F. Supp. 1005 (W.D.Va. 1979) (applying Virginia law); only one federal court has interpreted state law as having adopted Rosenbloom: ALASKA: Gay v. Williams, 486 F. Supp. 12 (D.Alaska 1979) (applying Alaska law); Cf., New York which declines to follow either Gertz or Rosenbloom, adopting instead an intermediate standard of gross negligence: NEW YORK: Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (Private individuals must prove gross negligence in matters of public concern.)
[4] Restatement (2d) of Torts, § 580B (1977) states as follows:

"§ 580B. Defamation of Private Person
One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them."
[5] Counsel for the Miami Herald, with characteristic candor and accuracy, conceded at oral argument in this cause that precious little which appears in the daily newspaper is not a matter of public or general concern. As such, all agree that the Rosenbloom rule effectively precludes a non-public person from recovering in most cases for defamatory falsehoods appearing in the daily press when such falsehoods are negligently uttered without due care as to their truth or falsity.
[6] In his second inaugural address on March 4, 1805, Jefferson, quite to the contrary, clearly endorsed the enforcement of state defamation laws. "No inference is here intended, that the laws, provided by the State against false and defamatory publications, should not be enforced; he who has time, renders a service to public morals and public tranquility, in reforming those abuses by the salutory coercions of the law...." The Life and Selected Writings of Thomas Jefferson 343 (A. Koch & W. Peden eds. 1944). Indeed, Jefferson was often exasperated by the excesses of the press of his day. "It is a melancholy truth, that a suppression of the press could not more completely deprive the nation of its benefits, than is done by its abandoned prostitution to falsehood. Nothing can now be believed which is seen in a newspaper. Truth itself becomes suspicious by being put in that polluted vehicle." The Life and Selected Writings of Thomas Jefferson, supra at 581 (June 11, 1807 letter to John Norvell). It is in that context that Dumas Malone, perhaps the country's most distinguished Jeffersonian scholar, writes: "His [Jefferson's] advocacy of freedom for the press was subject to certain qualifications. He believed that falsehood and defamation could and should be punished under state laws." D. Malone, Jefferson the President: Second Term 1805-1809 9 (1974). Moreover, Merrill Peterson, a prominent Jefferson biographer, adds: "There were very few principles he [Jefferson] held as absolutes and freedom of the press was not one of them. A press unrestrained to truth had not earned the right to unrestrained freedom." M. Peterson, Thomas Jefferson and the New Nation 716 (1970).
[7] "It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part." The Federalist No. 51 (J. Madison) 227 (Beard ed. 1964). "Man's capacity for justice makes democracy possible; but man's inclination to injustice makes democracy necessary." R. Niebuhr, The Children of Light and the Children of Darkness xiii (2d ed. 1960).
[8] See e.g., H. Salisbury, Without Fear or Favor (1980); D. Halberstam, The Powers That Be (1979). "[T]echnology has immeasurably increased the power of the press to do both good and evil. Vast communication combines have been built into profitable ventures." Rosenbloom v. Metromedia, Inc., 403 U.S. at 60, 91 S.Ct. at 1828 (White, J., concurring). Indeed, the mass media today is largely composed of business enterprises with a vast circulation and audience having often an immediate and significant impact on public opinion. It is surely beyond dispute, for example, that the Washington Post's courageous expose of the sordid Watergate scandal in 1972-73  which coverage was itself news and was widely publicized by other segments of the mass media  put in motion a series of public events which led to the resignation of President Richard Nixon in the face of almost certain impeachment, the only such resignation in our history. A power which decisively assists to bring down a President of the United States by the sheer might of the twentieth century pen is a force which cannot be dismissed as trifling.
[1] Two members of the Court joined Justice Brennan's opinion. Justice Douglas took no part in the disposition of the case. Justices White, Marshall, Harlan and Stewart expressly disavowed the proposition that the libel of a private individual in the reporting of a public event is not actionable absent actual malice. Thus, that proposition did not receive approval of the majority (five) of the quorum (eight) necessary to give it precedential effect. United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 558, 86 L.Ed. 796, 810 (1942); Hertz v. Woodman, 218 U.S. 205, 213-14, 30 S.Ct. 621, 622, 54 L.Ed. 1001, 1005-06 (1910). See Laird v. Tatum, 409 U.S. 824, 837-38, 93 S.Ct. 7, 15, 34 L.Ed.2d 50, 60 (1972) (memorandum of Rehnquist, J.); Chappell v. Emco Machine Works Co., 601 F.2d 1295, n. 6 (5th Cir.1979); Baker v. State, 15 Md. App. 73, 289 A.2d 348 (Ct.Spec. App. 1972), cert. denied, 411 U.S. 951, 93 S.Ct. 1940, 36 L.Ed.2d 413 (1973).
[2] Contrary to Judge Hubbart's assertion, our recent decision in Karp v. Miami Herald Publishing Co., 359 So.2d 580 (Fla. 3d DCA), appeal dismissed, 365 So.2d 712 (Fla. 1978), affirming a summary judgment in favor of the publisher does not contradict this conclusion. The proper standard of liability was not in issue in Karp, the parties having agreed to the trial judgle's determination that negligence was the standard of fault for private plaintiffs; a standard applied in reliance on the Florida supreme court's opinion in Firestone II, which was subsequently reversed by the United States Supreme Court. See note 3, infra. Since a decision in favor of the defendant on a negligence standard a fortiorari would have compelled the same result under the stricter "actual malice" analysis, we were not required to address the issue we now decide. See also Sobel v. Miami Daily News, Inc., 395 So.2d 282 (Fla. 3d DCA 1981) (mem. decision  court affirmed judgment for the publisher, citing to Rosenbloom). Other Florida courts have been similarly unsuccessful in attempts to delineate a post-Gertz stance. The Fourth District addressed this issue in a case involving a public figure libel action and although the court noted that defamation suits were governed by a dual standard for public and private individuals, it neglected to articulate what standard applied to private individuals. Finkel v. Sun Tattler Co., 348 So.2d 51 (Fla. 4th DCA 1977), cert. denied, 348 So.2d 135 (Fla. 1978). Another district stated that under Gertz, private plaintiffs no longer need prove actual malice, but also failed to state which standard of fault would apply. See Helton v. United Press International, 303 So.2d 650 (Fla. 1st DCA 1974), cited by the majority. That same court, as recently as last year, stated that "the Supreme Court of our state has not had or taken the opportunity to adopt an actual malice or simple negligence standard, and we restrain ourselves from doing so in this case." See From v. Tallahassee Democrat, Inc., 400 So.2d 52, 55 (Fla. 1st DCA 1981), petition for review denied, 412 So.2d 465 (Fla. 1982).
[3] In so concluding, I have not overlooked the language of the penultimate paragraph of the Florida supreme court opinion in Firestone II, providing in pertinent part:

Furthermore, this erroneous reporting is clear and convincing evidence of the negligence in certain segments of the news media in gathering the news.... A careful examination of the final decree prior to the publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty, and thus the wife would have been saved the humiliation of being accused of adultery in a nationwide magazine. This is a flagrant example of "journalistic negligence."
Firestone II, 305 So.2d at 178 (e.s.) After carefully reviewing the language of the entire opinion, I find that the two references to "negligence" captioned above were not intended as an exposition of a new state standard of liability in private actor/public event cases (particularly since the court did not so state); rather, they were meant merely as comment upon the indifference of certain news purveyors toward injuries inflicted upon private persons through inaccurate reporting. Even if my own analysis did not dispose me toward this conclusion, I would nonetheless be compelled to this view because it was on this basis that the decision was reversed in the United States Supreme Court, as contravening the requirement of Gertz:
There is nothing in the court's opinion which appears to make any reference to the relevance of some concept of fault in determining petitioner's liability.
Time, Inc. v. Firestone, 424 U.S. 448, 462, 96 S.Ct. 958, 969, 47 L.Ed.2d 154, 168, n. 7 (1976). Although it reversed the Florida supreme court's decision because recovery was allowed without proof of fault in contravention of the rule in Gertz, the United States Supreme Court did uphold the Florida court's finding that the Firestones' divorce action was not a matter of public concern. 424 U.S. at 453-55, 96 S.Ct. at 964, 47 L.Ed.2d at 162-63. Thus, even if Firestone II does indicate a tendency for Florida to adopt a negligence standard, this tendency would only apply to defamation suits not involving a matter of public concern.